**CASTAIC LAKE WATER AGENCY, et al., Plaintiffs,**

v.

**WHITTAKER CORP., et al., Defendants.**

**Whittaker Corp., Counter–Claimant,**

v.

**Castaic Lake Water Agency, et al., Counter–Defendants.**

**No. CV 00–12613 AHM.**

United States District Court, C.D. California.

July 15, 2003.

---

Frederic A. Fudacz, Andrew J. Yamamoto, Byron P. Gee, Alfred E. Smith, Nossaman Guthner Knox & Elliot, Los Angeles, CA, Scott D. Pinsky, Law Offices of Scott D. Pinskey, Long Beach, CA, for Plaintiffs.

Peter Muthig, Christensen Miller Fink Jacobs Glaser Weil & Shapiro, Richard A. Dongell, Thomas F. Vandenburg, Radcliff Dongell & Lawrence, Nancy Sher Cohen, Reynold Lloyd Siemens, Heller Ehrman White & McAuliffe, Los Angeles, CA, Joseph J. Armao, Heller Ehrman White & McAuliffe, San Francisco, CA, Lawrence J. Hilton, William E. Halle, Steven B. Imhoof, Hewitt & O'Neil, Irvine, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; ORDER DENYING COUNTER–CLAIMANT WHITTAKER CORP.'S MOTION FOR SUMMARY JUDGMENT

MATZ, District Judge.

This matter is before the Court on two motions for summary judgment. Plaintiffs move for summary judgment on their nuisance claims and their claims for recovery and declaratory relief under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* Defendant and Counterclaimant Whittaker Corporation ("Whittaker") moves for summary judgment on its counterclaims for declaratory relief under CERCLA and for contribution under both CERCLA and the California Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code § 25300 *et seq.*

## MOTION STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is material if it could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving

party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir.2000) (citations omitted).

When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'" *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (*citing Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.; Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### I. Introduction

This is a groundwater pollution case. Plaintiffs Newhall County Water District ("Newhall"), Santa Clarita Water Co. ("Santa Clarita") and Valencia Water Co. ("Valencia") contend that four of their water wells have been contaminated by perchlorate. The Newhall, Santa Clarita and Valencia water service areas and allegedly contaminated wells are found within the boundaries of Plaintiff Castaic Lake Water Agency ("Castaic" or "the Agency").

Plaintiffs believe the perchlorate at issue in this case originated at a nearby property, the Whittaker–Bermite site, and traveled in a spreading plume to contaminate the Newhall, Santa Clarita and Valencia wells. Defendants Whittaker and Santa Clarita L.L.C. ("SCLLC") are the past and present owners of the the Whittaker–Bermite site, and Plaintiffs contend that Defendant Remediation Financial, Inc. ("RFI") currently operates the site.

The complaint alleges eleven causes of action for: recovery and declaratory relief under CERCLA, contribution under CERCLA, negligence and negligence per se, nuisance and public nuisance, trespass, recovery under the California Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code § 25300 *et seq.*, and declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 &

2202. Plaintiffs also allege that Whittaker is strictly liable for damages incurred as a result of its ultrahazardous manufacturing activities.

Plaintiffs now move for summary judgment on their CERCLA and nuisance claims.

## II. The Parties

Newhall is a public agency organized and existing under the laws of California. August 26, 2002 Statement of Genuine Issues ("August 26 SGI") ¶ 55. *See* Cal. Water Code § 30000 *et seq.* (County Water District Law). Newhall provides water to customers living in the Santa Clarita Valley. Decl. of Kenneth J. Petersen ¶ 2. One of Newhall's wells, NC–11, allegedly has been contaminated by perchlorate. *Id.* ¶ 3.

Santa Clarita is a not-for-profit corporation that provides water to thousands of residential customers. August 26 SGI ¶ 60; Decl. of William J. Manetta ¶ 2.[1] Two of Santa Clarita's wells, Saugus–1 and Saugus–2, allegedly have been contaminated by perchlorate. Manetta Decl. ¶ 3.

Valencia is a California corporation that also provides water to thousands of residential customers. August 26 SGI ¶ 64; Decl. of Robert J. DiPrimio ¶ 2. One of Valencia's wells, VWC–157, allegedly has been contaminated by perchlorate. DiPrimio Decl. ¶ 3.[2]

Castaic is a public agency created and governed by the Castaic Lake Water Agency Law, Cal. Water Code App. § 103–1 *et seq. See* August 26 SGI ¶ 52. *See also Klajic v. Castaic Lake Water Agency,* 90 Cal.App.4th 987, 991, 109 Cal.Rptr.2d 454 (2001). The Castaic Lake Water Agency Law provides that the Agency "may acquire water and water rights ... and provide, sell, and deliver that water at wholesale only, for municipal, industrial, domestic, and other purposes ...." Cal. Water Code App. § 103–15.

Defendant Whittaker is a Delaware corporation doing business within this judicial district. August 26 SGI ¶ 45. Whittaker owned the allegedly contaminated Whittaker–Bermite site from 1967 to January 1999. *Id.* ¶ 46.

SCLLC is a Delaware limited liability company. *Id.* ¶ 43. SCLLC purchased the Whittaker–Bermite site in 1999 and is its current owner. *Id.* ¶ 44.

RFI is an Arizona corporation and the sole managing member of SCLLC. *Id.* ¶¶ 48–49.

## III. Analysis

### A. *Plaintiffs' CERCLA Claims*

Plaintiffs' complaint alleges CERCLA claims for cost recovery, 42 U.S.C. § 9607(a), contribution, 42 U.S.C. § 9607(a) and § 9613(f), and declaratory relief, 42 U.S.C. § 9613(g). Plaintiffs seek to recover their already incurred costs of response and to allocate responsibility for future response costs.

---

1. Plaintiffs have also submitted a Manetta Declaration in opposition to the summary judgment motion filed by Defendant and Counter–Claimant Whittaker. All references to declarations in this part of the Court's order are to declarations filed in support of or in opposition to Plaintiffs' summary judgment motion.

 When the Court refers to a declaration or document by date, the date used is the date on which the document was filed or lodged with the Court.

2. After Plaintiffs filed this case, they discovered that an additional well, the Stadium Well, also is contaminated with perchlorate. The parties have not fully briefed the issue of Defendants' liability for Stadium Well contamination, nor have they completed expert discovery. The Court will not rule on any issues presented by the alleged Stadium Well contamination in this order.

The *prima facie* elements of all three CERCLA claims are the same. *City of Portland v. Boeing Co.,* 179 F.Supp.2d 1190, 1199 (D.Or.2001) (elements of CERCLA cost recovery and contribution claims the same). *See also In re Dant & Russell, Inc.,* 951 F.2d 246, 249–50 (9th Cir.1991) (declaratory relief for future costs available once plaintiff has incurred at least some recoverable response costs).

In order to recover their response costs, Plaintiffs must establish that:

(1) perchlorate is a hazardous substance;

(2) there has been a release of perchlorate at Defendants' facility;

(3) the release or threatened release caused the Plaintiffs to incur necessary response costs consistent with the National Contingency Plan ("NCP"); [3] and

(4) Defendants are within one of four classes of persons subject to CERCLA's liability provisions.

*See Carson Harbor Village Ltd. v. Unocal Corp.,* 270 F.3d 863, 870–71 (9th Cir. 2001) (listing same requirements but classifying them as only four different elements); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989) (*en banc* ).

1. *Is Perchlorate a Hazardous Substance?*

"CERCLA defines 'hazardous substance' by reference to substances listed under various other federal statutes." *Cose v. Getty Oil Co.,* 4 F.3d 700, 704 (9th Cir.1993); 42 U.S.C. § 9601(14). Plaintiffs contend that perchlorate ($ClO_4$) qualifies as a CERCLA hazardous substances because it is "hazardous waste[s]" under the Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq.,* as amended by the Resource Conservation and Recovery Act ("RCRA"). *See* 42 U.S.C. § 9601(14)(C) (including Solid Waste Disposal Act hazardous wastes within CERCLA's definition of "hazardous substance").[4]

A "hazardous waste" is:

a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

The Solid Waste Disposal Act's implementing regulations categorize hazardous wastes as either "listed" hazardous wastes or "characteristic" hazardous wastes. 40 C.F.R. § 261.3(a). *See also United States*

---

**3.** The Court earlier bifurcated this action into liability and damage phases. Perhaps for this reason, the parties have not proffered evidence regarding the precise amount and types of costs incurred, and they have not yet fully briefed the issues of cost necessity and NCP consistency.

Although necessity and consistency with the NCP are elements of a CERCLA plaintiff's *prima facie* case, the Court believes it appropriate to leave these issues for resolution at a later date based on a complete record.

Thus, the order issued today is limited to a determination of liability for those response costs, if any, that will later be held necessary and NCP consistent.

**4.** The inclusion of RCRA hazardous wastes within the CERCLA definition of "hazardous substance" is subject to a limited exception not applicable . here. See 42 U.S.C. § 9601(14)(C); *Louisiana–Pacific Inc. v. Asarco Inc.,* 24 F.3d 1565, 1572 (9th Cir.1994) (discussing exception).

*v. Hansen,* 262 F.3d 1217, 1241 (11th Cir. 2001). "Characteristic" hazardous wastes are those wastes that are ignitable, corrosive, reactive or toxic, as those terms are defined in 40 C.F.R. §§ 261.21–261.24. *See* 40 C.F.R. §§ 261.3(a)(2)(i) and 261.20(a).

Plaintiffs claim, and Defendants do not dispute, that perchlorate meets the Solid Waste Disposal Act's definition of "solid waste." 42 U.S.C. § 6903(27) (solid waste is "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations"); 40 C.F.R. § 261.2 (solid waste is any "discarded material"—for example material that has been "disposed of" or "burned or incinerated"). The declaration of Bradley Peach, who formerly worked at the Whittaker–Bermite site, supports Plaintiffs' claim. Peach states that perchlorate was disposed of as waste at the Whittaker–Bermite site, including in burn pits. Decl. of Bradley D. Peach (attached as Exh. R to the July 9, 2002 Decl. of Byron P. Gee) ¶ 5.

Plaintiffs also proffer evidence sufficient to establish that perchlorate is a hazardous solid waste because it is ignitable. A solid waste exhibits the ignitability characteristic if it is an "oxidizer" as defined in 49 C.F.R. 173.127.[5] Section 173.127 defines "ozidizer" quite generally as any "material that may, generally by yielding oxygen, cause or enhance the combustion of other materials."

Plaintiffs' expert E. John List explains that "perchlorate is a strong oxidizing agent" that stores "significant potential chemical energy." Expert Rep. of E. John List (attached to Plaintiffs' July 25, 2002 Notice of Errata) at 2 [hereinafter "List Rep."]. For this reason, ammonium perchlorate and potassium perchlorate are used in the manufacture of fireworks, explosives and rocket propellants. *Id. See also* Expert Rep. of Franklin J. Agardy (lodged by Whittaker on July 29, 2002) at 3 (perchlorate used to manufacture explosives and solid propellants such as rocket fuels).

In addition, the Court takes judicial notice of two Environmental Protection Agency ("EPA") draft reports regarding perchlorate that were circulated in January 2002 and December 1998; both reports describe perchlorate as an "oxidizing anion."[6] EPA, Perchlorate Environmental Contamination: Toxicological Review and Risk Characterization (January 16, 2002) (attached as Exh. A to Plaintiffs' July 9, 2002 Request for Judicial Notice) at 8; EPA, Perchlorate Environmental Contamination: Toxicological Review and Risk Characterization Based on Emerging Information (December 31, 1998) (attached as Exh. B to Plaintiffs' July 9, 2002 Request for Judicial Notice) at 1–1. *See also Oregon Ass'n of Homes for the Aging, Inc. v. Oregon,* 5 F.3d 1239, 1243 n. 2 (9th Cir.1993) (court may take judicial notice of records and reports of administrative

---

**5.** The C.F.R. provision governing ignitability actually refers to the definition of "oxidizer" contained in 49 C.F.R. § 173.151 (as opposed to § 173.127), but no definition of "oxidizer" is contained within that section of the Code. Apparently the definition of "oxidizer" originally found in § 173.151 was moved to section § 173.127 as part of a comprehensive amendment to the Department of Transportation's Hazardous Materials Regulations, 49 C.F.R. parts 171–180. *See* 55 Fed.Reg. 52402–01 (Dec. 21, 1990). *See also* 49 Fed.

Reg. 23290–01 (June 5, 1984) (referring to the definition of "oxidizer" then contained in § 173.151: "An oxidizer for the purpose of this subchapter is a substance such as a chlorate, permanganate, inorganic peroxide, or a nitrate, that yields oxygen readily to stimulate the combustion of organic matter.").

**6.** The Court overrules Defendants' authentication objection. *See* Fed.R.Evid. 902(5) (publications purporting to be issued by a public authority are self-authenticating).

agencies); *Reynolds v. Bucks,* 833 F.Supp. 518, 520 n. 5 (E.D.Pa.1993) (taking judicial notice of EPA draft report finding that environmental tobacco smoke is a cause of lung cancer). Although these are draft reports circulated for peer review, the section relevant here—describing the chemical properties of perchlorate—was included in the 1998 draft, which has already been subject to public comment, and was not changed in the 2002 version of the report.

### 2. Did a Release of Perchlorate Occur at Defendants' Facility?

█ In order to establish that the Whittaker–Bermite site is a facility within the meaning of CERCLA, Plaintiffs must provide evidence that it is a "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). In order to establish that a release of perchlorate occurred at the site, Plaintiffs must provide evidence that perchlorate was spilled, leaked, pumped, poured, emitted, emptied, discharged, injected or disposed into the environment, or that it escaped or leached into the environment. 42 U.S.C. § 9601(22) (defining "release").

The Whittaker–Bermite site is a 996–acre property located at 22116 West Soledad Canyon Road in the City of Santa Clarita. August 26 SGI ¶ 1. Munitions and explosives were manufactured at the site from at least 1934 to 1987. *Id.* ¶ 2. Plaintiffs offer evidence sufficient to establish both that the site is a "facility" as that term is defined in CERCLA and that perchlorate was released at the site. First, Bradley Peach declares that during his employment at the Whittaker–Bermite facility perchlorate was regularly delivered to the site, waste containing perchlorate was disposed of in burn pits, and perchlorate chemicals and perchlorate containing waste periodically spilled onto the ground at the site.[7] Peach Decl. ¶¶ 3–7. Second, tests conducted at the site reveal the existence of perchlorate. *See, e.g.,* Expert Rep. of David Keith Todd (attached as Exh. 2 to Plaintiffs' July 25, 2002 Notice of Errata) at 26 (summarizing on-site soil tests for perchlorate) [hereinafter "Todd Rep."]; List Rep. at App. 1; Acton Mickelson Environmental, Inc., Draft Remedial Investigation Report (January 1997) (attached as Exh. A to the July 9, 2002 Gee Decl.) at 6–138 (reporting perchlorate found in site soil sample).[8] *See also* U.S.

7. Peach was employed at the Whittaker–Bermite facility from 1978 to 1984. He worked primarily in inventory-related activities and his job responsibilities "included receiving, storing and transporting raw materials and transporting and storing waste materials, including waste containing perchlorate." Peach also sometimes worked as the "firewatch" at the site's waste burn pits. Peach Decl. ¶ 1.

The Court denied Defendants' earlier motion to exclude the Peach declaration but allowed Defendants to depose Peach, which they did on November 21, 2002. Defendants now object that certain statements in the Peach declaration are speculative and lack foundation, and Defendants cite portions of the November 21 Peach deposition as support for their objection.

The cited deposition testimony is not relevant to, and therefore does not undermine, Peach's statements regarding disposal at burn pits or perchlorate spilling. Peach's deposition testimony does call into question the specific numerical estimates regarding perchlorate deliveries that Peach included in his original declaration, but the cited deposition testimony actually supports the more general proposition that Peach has personal knowledge of at least *some* perchlorate deliveries to the Whittaker–Bermite site. *See* Peach Dep. (attached as Exh. 8 to the May 12, 2003 Decl. of Matthew Clark Bures) at 132:6–133:23.

8. Defendants object that this evidence is inadmissible. Defendants first object that the Acton Mickelson environmental report attached as Exh. A to the Gee Declaration has not been

Army Corps of Engineers Remedial Investigation Technical Mem. No. 1 Attachment B (monitoring well test results showing detection of perchlorate on the Whittaker–Bermite site) (proffered by both Plaintiffs, June 5, 2003 Gee Decl. Exh. A, and by Defendants, May 27, 2003 Decl. of Brian T. Kelleher, and relied on by both Plaintiffs' experts, *see, e.g.*, June 5, 2003 List Decl. ¶ 5, and by Defendants' expert N. Thomas Sheahan, May 27, 2003 Sheahan Decl. ¶ 3).

### 3. *Did the Release of Perchlorate at the Whittaker–Bermite Site Cause Plaintiffs to Incur Response Costs?*

 To prove this element of their prima facie case, Plaintiffs must proffer evidence sufficient to establish that a release or threatened release from the Whittaker–Bermite site caused them to incur response costs.

### (a) Have Plaintiffs incurred response costs?

CERCLA does not define the term "response cost." However, "response" is defined to mean "remove, removal, remedy, and remedial action" and all "enforcement activities related thereto." 42 U.S.C. § 9601(25). The terms "remove" and "removal" are in turn defined to include "cleanup or removal" and "actions as may be necessary to monitor, assess, and evaluate the release or threat of release," as well as "disposal of removed material" and "such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment." 42 U.S.C. § 9601(23). The terms "remedy" or "remedial action" mean "those actions consistent with permanent remedy taken instead of or in addition to removal actions." 42 U.S.C. § 9601(24).

properly authenticated. Fed.R.Evid. 901. While it is true that Mr. Gee (an attorney for Plaintiffs) cannot authenticate the report, Defendant SCLLC produced the document itself in response to Plaintiffs' discovery requests. Gee Decl. ¶¶ 2–3. *See Maljack Productions, Inc. v. GoodTimes Home Video Corp.* (9th Cir. 1996), 81 F.3d 881, 889 n. 12 (document authenticated when produced by defendant in discovery); *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1089 (5th Cir.1988) (same). *Cf. also Orr v. Bank of America, NT & SA*, 285 F.3d 764, 776 & n. 20 (9th Cir.2002) (citing *Maljack* and *Snyder*). And although originally the report was prepared for Whittaker, not SCLLC, Whittaker is a party to this proceeding, Whittaker does not contend that the document is other than what it purports to be, and all Defendants (including Whittaker) actually cite the report in their SGI. *See* July 29 SGI ¶ 21 (reiterating authenticity objection but also citing the report as evidence). *Cf. Maljack*, 81 F.3d at 889 n. 12 (relying on, *inter alia*, fact that objecting party did not actually dispute authenticity of the admitted document); *Snyder*, 839 F.2d at 1089 (same). The Court finds this "sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a).

Defendants also object that the Acton Mickelson report is inadmissible as hearsay and that the cited portions of the Todd and List

reports contain inadmissible hearsay. But SCLLC, which produced the report, admitted that it qualifies as a business record within the meaning of Fed.R.Evid. 803(6) by failing timely to respond to Plaintiffs' Request for Admissions. *See* Gee Decl. (attached as Tab M to Plaintiffs' Response to Defendants' Compendium of [Evidentiary] Objections) ¶¶ 1–4 & Exh. B. *See also* Fed.R.Civ.P. 36(a) Advisory Committee Notes (1970 Amend.) (requests for admission may address mixed questions of law and fact); *Marchand v. Mercy Medical Ctr., et. al.*, 22 F.3d 933, 937 n. 4 (9th Cir. 1994) (treating as proper a request for admission asking Defendant to admit that the treatment provided to Plaintiff "failed to comply with the applicable standard of care"). As to the Todd and List reports: ·Experts are permitted to rely on hearsay in forming their opinions, and the test data Todd and List relied on is therefore admissible because it was part of the basis for their expert opinions that perchlorate released at the Whittaker–Bermite site migrated to Plaintiffs' wells. *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 873–74 (9th Cir.2001) (en banc).

For these reasons, Defendants objections are overruled.

Preventive monitoring and provision of alternative water supplies are listed in the statute as examples of removal and remedial actions. 42 U.S.C. § 9601(23), § 9601(24).

In order to establish that they have incurred some response costs, Plaintiffs offer the declarations of David Kimbrough (Castaic's Water Quality and Laboratory Supervisor), Kenneth J. Petersen (Newhall's General Manager), William J. Manetta (Santa Clarita's President), and Robert J. DiPrimio (Valencia's President).[9]

Kimbrough declares that Castaic supplements local Santa Clarita groundwater resources with water imported through the State Water Project. Kimbrough Decl. ¶ 2. Castaic provides such water at wholesale prices to water retailers—including Newhall, Santa Clarita and Valencia— within the agency's boundaries. *Id.* ¶ 2. *See also* Cal. Water Code App. § 103–15 (listing powers of agency); *id.* § 103–29.5 (providing for allocation of the agency's water supplies among area purveyors); *id.* § 103–4.8 (defining "purveyor" to mean those retail water distributors with facilities connected to the agency's water transmission system as of April 15, 1986). Kimbrough declares that Castaic has already

spent "$300,000 in engineering and consulting fees to study the perchlorate release and devise a clean-up plan for the perchlorate problem." Kimbrough Decl. ¶ 4. Castaic is also the local agency sponsor of an Army Corps of Engineers study of contamination at the Whittaker–Bermite site, although it is unclear what expenditures (if any) this sponsorship entails. Decl. of Lynn M. Takaichi (Castaic's Agency Engineer) (attached to Plaintiffs' Aug. 12, 2002 Reply) ¶¶ 2–5.

Petersen, Manetta and DiPrimio each declare that their respective companies— retail purveyors within Castaic's boundaries—tested their wells for perchlorate contamination in 1997 at the request of California's Department of Health Services. Petersen Decl. ¶ 3; Manetta Decl. ¶ 3; DiPrimio Decl. ¶ 3. After detecting perchlorate, Newhall, Santa Clarita and Valencia took their contaminated wells out of service. Petersen Decl. ¶ 5; Manetta Decl. ¶ 5; DiPrimio Decl. ¶ 5. Peterson, Manetta and DiPrimio each declare that their respective companies have since spent substantial sums on additional sampling, as well as consulting fees and alternative water supplies. Petersen Decl. ¶ 6 (Newhall has spent $200,000);[10] Manetta Decl. ¶ 6 (Santa Clarita has spent $1,500,-

---

**9.** Defendants object to these declarations as lacking foundation. In fact, Defendants raise lack of foundation objections to nearly every declaration Plaintiffs have filed.

The Court has only considered those objections relevant to evidence cited in this order, but it appears to the Court that many of Defendants' foundation objections—including those made to the Kimbrough, Petersen, Manetta, and DiPrimio declarations—lack merit. Although the Court applauds zealous advocacy, it deplores the numbing repetition of plainly non-meritorious (indeed, frivolous) evidentiary objections.

As to these specific declarations, each of the witnesses identifies his relevant position of authority with the Plaintiff entities, and each states that he has personal knowledge of the facts set forth in his declaration. These statements are sufficient, and neither Fed.R.Evid.

602 nor *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir.1999) suggests otherwise.

**10.** Defendants contend that Newhall does not need to purchase alternative water supplies because its remaining non-contaminated wells meet Newhall's demand. *See* August 26 SGI ¶ 59. Defendants also contend that it is actually cheaper for Newhall to purchase substitute water from Castaic than to produce water itself. *Id.* Defendants cite to portions of the deposition of Dustan Campbell, Newhall's Superintendent, as support for these arguments. *Id.*

The Court has reviewed the Campbell deposition, taken on March 5, 2002. Campbell testified that as of the date of his deposition, Newhall did have an adequate water supply. Campbell Dep. (attached as Exh. E to the July 29 Decl. Thomas F. Vandenburg) at 105:1–5 (Question: "Does [Newhall] have the capacity

000);[11] DiPrimio Decl. ¶ 6 (Valencia has spent $50,000).[12] Petersen, Manetta and DiPrimio each declare that these costs have been incurred as a "direct result of [the] perchlorate contamination." Petersen Decl. ¶ 6; Manetta Decl. ¶ 8; DiPrimio ¶ 6.

The costs Plaintiffs have incurred qualify as removal or remedial costs because CERCLA's definitions of those terms include actions "necessary to monitor, assess, and evaluate a release or threat of release" and "provision of alternative water supplies." 42 U.S.C. § 9601(23), (24). Plaintiffs have thus presented sufficient evidence to establish that they have incurred CERCLA response costs as a result of the perchlorate contamination detected in the Newhall, Santa Clarita and Valencia wells.

(b) Were Plaintiffs' response costs "caused" by Defendants' releases?

Much of Defendants' opposition is directed to an argument that Plaintiffs have failed to satisfy CERCLA's causation requirement. Analysis of this argument requires consideration of (i) causation principles applied in two-site water migration cases, (ii) the geography of the Whittaker–Bermite site and surrounding area, and (iii) the specific causation-related evidence submitted on this motion.

i. Causation principles

This is a "two-site" CERCLA case. Plaintiffs claim that contaminant at one

---

from the wells that are currently active to meet its demand today?" Answer: "Today, yes, it does."). Campbell also testified that beginning in August, 2001, Newhall could purchase water at the same cost, or even more cheaply, than producing water itself. *Id.* at 105:10–106:25.

But neither of these deposition excerpts undermines Newhall's cost estimate to the extent it is based on the provision of alternative water supplies. Campbell's testimony does not address Newhall's need for alternative water supplies before or after March, 2002, and it does not suggest that purchasing water from Castaic was cheaper for Newhall at all relevant times prior to August, 2001. In this regard, it is noteworthy that perchlorate was first detected in a Newhall well in 1997. Petersen Decl. ¶ 3.

11. Although Santa Clarita claims that some of this $1,500,000 has been spent on alternative water supplies, Robert McDougal, Santa Clarita's Operations Manager, testified during deposition that since shutting down its contaminated wells, Saugus–1 and Saugus–2, Santa Clarita has still had water supplies adequate to meet its needs. McDougal Dep. (attached as Exh. G to the July 29, 2002 Vandenburg Decl.) at 135:7–137:24. (Plaintiffs' counsel objected to this line of questioning during the McDougal deposition as argumentative and vague. The Court hereby overrules those objections.)

This testimony does create a genuine issue as to whether Santa Clarita has actually spent any money on alternative water supplies. McDougal's testimony does not, however, create a genuine issue sufficient to defeat Santa Clarita's summary judgment motion. At this stage in the case, and consistent with the Court's bifurcation order, Plaintiffs have not submitted itemized cost statements, and Santa Clarita identifies two other bases for the $1,500,000 figure—consulting and sampling fees. Defendants present no evidence that Santa Clarita has not incurred consulting and sampling costs.

12. DiPrimio testified that as of the date of his deposition, March 29, 2002, Valencia could meet demand with water pumped from Valencia's own wells. DiPrimio Dep. (attached as Exh. F to the July 29, 2002 Vandenburg Decl.) at 85:10–15. In other words, as of March 29, 2002, Valencia did not need to purchase alternative water supplies to meet demand.

DiPrimio's testimony does not, however, create a genuine issue sufficient to deny summary judgment. DiPrimio did not discuss pre-March 2002 water supplies during his deposition, nor did he undermine Valencia's claim to have incurred costs for sampling and consulting fees.

location—the Whittaker–Bermite site—has migrated to reach a different location—Plaintiffs' wells.[13] The issue of causation in two-site cases is a difficult one, and the Court has reviewed numerous cases in an attempt to determine the appropriate causation standard to be applied here. The Court has found *Westfarm Associates Limited Partnership v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669 (4th Cir.1995), *United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir.1992), *Artesian Water Co. v. New Castle County*, 659 F.Supp. 1269 (D.Del.1987), *aff'd on other grounds* 851 F.2d 643 (3d Cir.1988), and *United States v. Bliss*, 667 F.Supp. 1298 (E.D.Mo.1987), to be the most instructive.

In *Westfarm*, a case cited by Defendants themselves, Westfarm Associates Limited Partnership ("Westfarm"), a Maryland real estate developer, discovered that groundwater beneath its property was contaminated with perchloroethylene ("PCE"). 66 F.3d at 673. After conducting an investigation, Westfarm concluded that the PCE originated with the International Fabricare Institute ("IFI"), a neighboring landowner and dry cleaner trade association, and had leaked onto Westfarm's property through cracks in the sewer system leading from IFI. *Id.* Westfarm inspected the sewer system itself and detected several flaws. *Id.* at 674. Westfarm also found PCE in the sewer leading from IFI. *Id.*

Westfarm sued IFI under CERCLA and also sued the Washington Suburban Sanitary Commission ("WSSC"), the local sewer system operator. The district court granted summary judgment in Westfarm's favor on its CERCLA claim, and WSSC appealed. WSSC argued that summary judgment should not have been granted because WSSC's expert testimony created a genuine issue of material fact as to cau-

sation. *Id.* at 681–82 The Fourth Circuit emphatically rejected this argument and explained that WSSC fundamentally misunderstood the CERCLA plaintiff's causation burden:

> Contrary to the rule followed in most areas of the law, the burden of proof as to causation in a CERCLA case lies with the defendant. The plaintiff must prove only that contaminants which were once in the custody of the defendant could have travelled onto the plaintiff's land, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs. The plaintiff need not produce any evidence that the contaminants did flow onto its land from the defendant's land. Rather, once plaintiff has proven a *prima facie* case, the burden of proof falls on the defendant to *disprove causation.*

*Id.* at 681 (emphasis added) (citations omitted).

WSSC's expert opined that "current evidence [did] not substantiate the WSSC as a source of PCE contamination to the underlying aquifer." *Id.* at 681. Nevertheless, applying the burden-shifting scheme explained above, the Fourth Circuit held that WSSC failed to create a genuine issue. Because the WSSC's expert testimony indicated only that Westfarm might not be able to *prove* causation—not that WSSC could *disprove* causation—it was insufficient to deny summary judgment. In other words, "[b]ecause the burden lay on WSSC to *disprove* that it was a source of PCE, the fact that the evidence on summary judgment produced a genuine dispute as to whether the evidence *proved* WSSC to be a source was not material, and could not serve as a basis to deny

---

**13.** Actually, Plaintiffs' wells are in several different locations, making this more of a "sev-

eral-site" case. But the principles applicable to two-site cases are applicable here.

summary judgment to Westfarm." *Id.* at 682. *See also Alcan,* 964 F.2d at 264–66 (plaintiffs in a "multi-generator" CERCLA case cannot be required to trace the cause of the response costs to each responsible party); *Artesian Water,* 659 F.Supp. at 1281–82 (defense expert's opinion that "it [could not] be stated to any reasonable degree of probability" that toxic wastes came from defendant's site, and defendant's identification of another potential source, were insufficient to create a genuine issue because plaintiff did not bear the burden of "fingerprint[ing]" any particular PRP's waste); *Bliss,* 667 F.Supp. at 1311 ("[D]efendants, not the plaintiff, [bore] the burden of showing that the hazardous substances at the site came solely from a third party.")

■ Although *Westfarm, Alcan, Artesian* and *Bliss* involve a variety of factual scenarios, they all stand for a common causation principle: in a two-site CERCLA case, the plaintiff meets its burden on summary judgment if it (a) identifies contaminant at its site, (b) identifies the same (or perhaps a chemically similar) contaminant at the defendant's site, and (c) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site.[14] If the plaintiff meets this burden, the defendant must then proffer evidence sufficient to create a genuine issue of fact as to its ability to disprove causation.

The Court finds this analysis persuasive and applicable to the facts of this case. The *Westfarm* burden-shifting approach is in keeping with CERCLA's broad remedial purpose, *see generally Hanford Downwinders Coalition, Inc. v. Dowdle,* 71 F.3d 1469, 1481 (9th Cir.1995), and is consistent with the "minimum causal nexus" most courts require under CERCLA. *See, e.g., United States v. Monsanto,* 858 F.2d 160, 170 n. 17 (4th Cir.1988). *See also Artesian Water,* 659 F.Supp. at 1282 (requiring plaintiffs to "fingerprint" individual defendant's waste would allow PRPs "to avoid financial responsibility for the cleanup.").[15]

#### ii. The setting

The Whittaker–Bermite site is a 996–acre property located in the Santa Clarita Valley. August 26 SGI ¶ 1. The Santa Clara River runs west of the site, and water in the river flows north. *See* May 13, 2002 Expert Rep. of Grant L. Ohland [hereinafter "Ohland Rep."] Fig. 1. Plaintiffs' four wells lie directly west and northwest of the Whittaker–Bermite site, roughly along the Santa Clara River. *Id.*

Of Plaintiffs' four wells, NC–11 is the furthest south. It is located between the Santa Clara River and the southwest corner of the Whittaker–Bermite site; the well is closer to the river than it is to the

---

**14.** In *Alcan,* the plausible migration pathway was an undisputed release of thousands of gallons of water from the contaminated site into the Susquehanna River. 964 F.2d at 256. The plausible pathway in *Artesian Water* was underground migration. 659 F.Supp. at 1281. In *Bliss,* the United States offered evidence that waste from a large storage site had been transported to, and sprayed at, another site; although the defendants argued that *their* waste may not have been so transported, the Court held that the government's evidence of a plausible route was sufficient. 667 F.Supp. at 1309–11.

**15.** For these same reasons, the Court finds unpersuasive, and declines to adopt, the stricter causation requirement suggested by the Sixth Circuit's holding in *Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 171 F.3d 1065, 1072 (6th Cir.1999) (plaintiff's expert's affidavit, which created a genuine issue only as to the "possibility" that contaminant migrated from the defendant's site, insufficient on summary judgment because plaintiff bore "the burden of proof to show that [defendant] did contribute to [contaminant] ..., not that it is possible that it might have contributed ...."). *See also United States v. Dico,* 136 F.3d 572, 578 (8th Cir.1998).

site. Saugus–2 and then Saugus–1 are further north. *Id.* Saugus–2 is directly west of the northwest corner of the Whittaker–Bermite site, and the well is (like NC–11) in between the site and the Santa Clara River. *Id.* Saugus–1 is north and west of the site's northwest corner, and it is just on the west side of the river. *Id.* VWC–157 is north and west of the Saugus wells and of the Whittaker–Bermite site. VWC–157 is also west of the river—further west, in fact, than is Saugus–1. *Id.*

### iii. Plaintiffs have met their causation burden

■ Applying the principles set out above, the Court finds that Plaintiffs have proffered evidence sufficient to meet their burden as to causation. Perchlorate has been detected in the Newhall, Santa Clarita and Valencia wells. *See* Ohland Rep. Table 1; Todd Rep. at 12.[16] Perchlorate also has been detected at the Whittaker–Bermite site. *See* n. 8 *supra* and accompanying text.

As to migration pathways, Plaintiffs' and Defendants' experts generally agree that perchlorate might travel to Plaintiffs' wells via surface water, the Alluvial Aquifer or the Saugus Formation.[17] *Compare* Ohland Rep. at 24–28 *with* Todd Rep. at 33–34. For purposes of this motion, the Court need only focus on surface water as a plausible migration pathway.

Plaintiffs' hydrogeology experts, Drs. List and Todd, opine that the perchlorate detected in surface water runoff from areas in the southwest corner of Whittaker–Bermite site travels through canyons located in the southwestern section of the site and enters the South Fork of the Santa Clara River upstream of the Plaintiffs' four wells. List Rep. at 7; Todd Rep. at 33–34. Although Plaintiffs' wells draw from the underlying Saugus formation, Dr. Todd opines (based on perchlorate detection in groundwater on the Whittaker–Bermite site) that perchlorate traveling in surface water infiltrates both the Alluvial Aquifer and underlying Saugus formation—making surface water a "viable migration pathway[ ]" to Plaintiffs' wells. Todd Rep. at 33. *See also* List Rep. at 7. Dr. List also opines, based on tests conducted near the site's northern border, that such infiltration down from surface water "is likely to be significant wherever surface runoff has occurred." List Rep. at 7. Finally, Dr. Todd explains that perchlorate, which is denser than water, will sink by gravity downward through the water column. Todd Rep. at 32.

This expert evidence is sufficient to establish that transport through surface water entering the Santa Clara River upstream of Plaintiffs' wells, combined with subsequent infiltration through the Alluvial Aquifer and Saugus Formation near Plaintiffs' wells, is a plausible migration pathway for perchlorate to travel from the Whittaker–Bermite site to the wells.

In opposition, Defendants rely primarily on the expert testimony of Grant L. Ohland. Ohland, however, agrees with many of Plaintiffs' experts' conclusions regarding surface water (and subsequent downward migration into underlying aquifers) as a potential migration pathway to Plaintiffs' wells. For example, Ohland agrees that surface water is a potential pathway; he, too, cites data showing perchlorate in surface water run-off from the southwest portion of the Whittaker–Bermite site; he agrees that this surface water run-off travels to the South Fork of the Santa Clara River upstream of Plaintiffs' wells; he

---

**16.** Defendants evidentiary objections to the admissibility of this data contained in both Plaintiffs' and Defendants' expert reports are overruled. *See supra* note 8.

**17.** The Alluvial Aquifer and underlying Saugus Formation are the two principal aquifers in the Upper Santa Clara River Valley. Ohland Rep. at 11.

agrees that surface water run-off has "the potential to transport perchlorate considerable distances in short periods of time"; and he agrees that surface water recharges the underground aquifers from which Plaintiffs' wells draw. Ohland Rep. at 24, 41–42.

To the extent Ohland disputes Plaintiffs' contentions about this migration pathway, his conclusions are insufficient to create a genuine issue:

1. Ohland opines that perchlorate in the amounts recently detected in surface water run-off from the Whittaker–Bermite site would not result in the "concentrations reported in the Plaintiffs' wells." Ohland Rep. at 41–42. *See also* May 27, 2003 Expert Rep. of N. Thomas Sheahan at 7 (opining that perchlorate migrating in groundwater from the northwest corner of the Whittaker–Bermite site could not have caused the *concentration* levels reported in Saugus–1 and Saugus–2).[18] But Plaintiffs need not prove that *all* the perchlorate in their wells comes from the Whittaker–Bermite site in order for Defendants to be liable either jointly and severally or in contribution for their own equitable share. *See Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 945 (9th Cir.2002) (defendant in cost recovery action under CERCLA § 107 may be held jointly and severally liable for entire cost of clean-up even though it only contributed a fraction of the contamination; defendant in CERCLA contribution action will be liable for its own equitable share).

2. Ohland also opines that several other nearby facilities "likely released perchlorate to the environment." Ohland Rep. at 45. *See also* February 10, 2003 Supplemental Ohland Rep. at 8 (dis-

charges from nearby wastewater treatment plant are a "potential source" of perchlorate in Plaintiffs' wells). However, the relevance of this opinion to Defendants' ability to disprove causation is fatally undermined by Ohland's ultimate conclusion—namely, that it is not possible, based on currently available data to "determine the source of perchlorate reported in Plaintiffs' wells" or to determine which of the potential migration pathways from alternative sources conveyed perchlorate to Plaintiffs' wells. Ohland Rep. at 39, 45. *See Westfarm*, 66 F.3d at 682 (expert testimony that "[c]urrent evidence [did] not substantiate [defendant] as a source of PCE contamination" insufficient to create a genuine issue of material fact).

In sum, Ohland's expert opinion comes down to this: (1) perchlorate might have migrated from the Whittaker–Bermite site to Plaintiffs' wells via surface water and subsequent infiltration, but surface water migration alone likely could not cause *all* of the contamination in Plaintiffs' wells and (2) other nearby facilities might have released perchlorate in the direction of Plaintiffs' wells, but it is impossible to determine sources based on available data. Because neither of these opinions indicates that Defendants can *disprove* that the Whittaker–Bermite site was *a cause* of perchlorate contamination in Plaintiffs' wells, Defendants have failed to create a genuine issue of material fact that would preclude summary judgment for the Plaintiffs.

### 4. Are Defendants within the Classes of Persons Liable under CERCLA?

This question is easily answered as to two of the Defendants—SCLLC and Whittaker:

---

**18.** Defendants' *Ex Parte* Application for leave to file the supplemental Sheahan declaration and report is GRANTED, and the Court has considered Sheahan's supplemental opinions in ruling on these motions.

SCLLC is the current owner of the Whittaker–Bermite site. August 26 SGI ¶ 44. This is sufficient under CERCLA, which imposes liability on the current owner of a facility. 42 U.S.C. § 9607(1).

■ Whittaker owned and operated the site from 1967 to January, 1999. August SGI ¶ 46. As a former owner, Whittaker is liable if it owned the site "at the time of disposal of any hazardous substance." 42 U.S.C. § 9607(2). "CERCLA defines 'disposal' for purposes of § 9607(a) with reference to the definition of 'disposal' in RCRA, see 42 U.S.C. § 9601(29), which in turn defines 'disposal' as follows:

> The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

*Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 875 (9th Cir.2001) (quoting RCRA, 42 U.S.C. § 6903(3)).

The Peach declaration establishes that Whittaker owned the site when a disposal of perchlorate occurred. As recounted above, Peach declares that during his employment at the Whittaker–Bermite facility perchlorate was regularly delivered to the site, waste containing perchlorate was disposed of in burn pits, and perchlorate chemicals and perchlorate containing waste periodically spilled onto the ground at the site. Peach Decl. ¶¶ 3–7.

The liability of Defendant RFI presents more difficult questions. Plaintiffs contend that Defendant RFI is liable as the current operator of the Whittaker–Bermite site. RFI is the sole managing member of

SCLLC, the present owner of the site, and Plaintiffs rely on the operator theory of liability elaborated in *United States v. Bestfoods,* 524 U.S. 51, 67–73, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), to argue that RFI is liable. In opposition, RFI directs the Court's attention to a motion for summary judgment it filed on this very issue and to the evidence filed in support of that motion. However, RFI later withdrew its summary judgment motion after the Court directed the parties to consider carefully each side's respective Fed.R.Civ.P. 56(f) requests; Plaintiffs had opposed RFI's motion at least in part based on Rule 56(f). For that reason, the Court believes it would be inappropriate to rule on the issue of RFI's liability at this time. It would not be fair to grant judgment against RFI when the withdrawal of RFI's motion (at the Court's own suggestion) has deprived it of any defense.

Thus, Plaintiffs' motion is denied as to RFI without prejudice to Plaintiffs' or RFI's moving again for summary judgment on this issue at a later date.

### 5. *Summary of Ruling and Request for Additional Discovery*

For the foregoing reasons, Plaintiffs are entitled to summary adjudication in their favor on the following issue: Are Defendants Whittaker and SCLLC liable to Plaintiffs for those response costs Plaintiffs have incurred that are later determined to have been necessary and consistent with the NCP? [19] The answer is: yes.

Defendants' request for additional time to conduct discovery, Fed.R.Civ.P. 56(f), is DENIED. In his declaration, Matthew Clark Bures states that Defendants seek additional information regarding two monitoring wells, MW–1 and MW–2, and the

---

**19.** As discussed in the Conclusion below, this order does not decide whether Plaintiffs' CERCLA claims are actually for cost recovery under 42 U.S.C. § 9607(a) or for contribution under 42 U.S.C. § 9607(a) and § 9613(f).

Stadium Well. May 12, 2003 Decl. of Matthew Clark Bures Decl. ¶ 8. But the Court has not considered any of Plaintiffs' claims as to perchlorate contamination in the Stadium Well in ruling on these motions, and defense expert Ohland already has offered his opinion that the detection of perchlorate at MW–2 supports Defendants' case. *See* February 10, 2003 Supplemental Expert Rep. of Grant L. Ohland at 7–8. Defendants have not explained how the additional data they seek is "essential" to resisting Plaintiffs' motion. *State of California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998).

Bures also declares that Defendants seek additional data regarding the Army Corps of Engineers study of contamination in the Santa Clara Valley. Bures Decl. ¶ 9. But Defendants obtained the Army Corps' Technical Memorandum No. 1 after filing the Bures declaration, and the Court has considered Sheahan's recently filed opinion regarding that Memorandum in ruling on this motion.

### B. *Plaintiffs' Public Nuisance Claim*

■ A nuisance affecting "an entire community or neighborhood, or any considerable number of persons" is a public nuisance. Cal. Civ.Code § 3480. Polluted groundwater is a public nuisance under California law, *State of California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998), and in this case, numerous tests have demonstrated that perchlorate is present in the groundwater underneath the Whittaker–Bermite site. *See, e.g.,* Figure 1 attached to May 27, 2003 Sheahan Rep. Thus, the only questions remaining as to Plaintiffs' public nuisance claims are (1) whether Plaintiffs are parties authorized to sue for abatement of a public nuisance and (2) whether Plaintiffs' claims are barred by the applicable statute of limitations.

### 1. *Who May Bring a Public Nuisance Claim?*

Actions to abate a public nuisance may be maintained either by a public body authorized by law or by a private party who has been specially injured by the nuisance. Cal. Civ.Code § 3493, § 3494. When an authorized public agency sues to abate a public nuisance, no statute of limitations applies. Cal. Civ.Code § 3490. However, a private party's suit for public nuisance is subject to the three-year statute of limitations in Cal.Code Civ. Proc 338(b). *Mangini v. Aerojet–General Corp.,* 230 Cal. App.3d 1125, 1142–43, 281 Cal.Rptr. 827 (1991) [hereinafter *"Mangini I"*].

#### (a) Authorized public bodies

■ Plaintiffs contend that Newhall and Castaic are public bodies authorized by law to maintain claims for public nuisance. Newhall is a water district established under California's County Water District Law, Cal. Water Code § 30000, and Castaic is a water agency created pursuant to its own enabling act, the Castaic Lake Water Agency Act, Cal. Water Code App. § 103–1 *et seq.* Newhall and Castaic both have the power to sue and be sued, and Newhall in particular has the power to institute "actions and proceedings to prevent interference with or diminution of the . . . natural subterranean supply of waters which may [b]e used or be useful for any purpose of the district." Cal. Water Code § 31082.

In a very recent case, however, the California Court of Appeal held that only public bodies *explicitly* authorized to abate a public nuisance may do so. *Lamont Storm Water District v. Pavich,* 78 Cal. App.4th 1081, 93 Cal.Rptr.2d 288 (2000). The plaintiff in *Lamont,* a storm water district created pursuant to the Storm Water District Act of 1909, Cal. Water Code App. § 13–1 *et seq.,* had the power to sue and be sued and to "do any and all other acts and things necessary or required for

the protection of the lands in said district from damage from storm waters and from waters of any innavigable stream, watercourse, canyon or wash ...." 78 Cal. App.4th at 1084, 93 Cal.Rptr.2d 288.

But the appellate court found this seemingly expansive language not to be dispositive, explaining that "when the Legislature has intended to grant the power to abate a nuisance, it has done so specifically and in clear terms." *Id.* For example, § 731 of the California Civil Procedure Code specifically gives county district attorneys and city attorneys the authority to abate a public nuisance. And § 2060 of the California Health and Safety Code gives Mosquito Abatement and Vector Control Districts the authority to abate public nuisances. Noting the absence of any similar provision in the Storm Water District Act, the *Lamont* court held that the plaintiff district could not maintain a public nuisance action. 78 Cal.App.4th at 1086, 93 Cal.Rptr.2d 288.

Under California's statutory scheme and precedent, *Lamont* is supportable. No court has reached an opposite conclusion or rejected it. This Court is bound by decisions of California's intermediate appellate courts absent "convincing evidence" that the California Supreme Court would decide the issue differently. *In re Watts,* 298 F.3d 1077, 1082 (9th Cir.2002). Thus, guided by *Lamont,* the Court concludes that Newhall and Castaic are not public bodies specifically authorized to abate a public nuisance.

(b) Specially injured parties

■ Private plaintiffs like Santa Clarita and Valencia may have standing to bring a public nuisance action if they have been specially injured by the nuisance. Cal. Civ.Code § 3494. In this case, both Santa Clarita and Valencia have proffered evidence that they sampled their wells near the Whittaker–Bermite site for perchlorate at the request of the California Depart-ment of Health Services. DiPrimio Decl. ¶ 2; Manetta Decl. ¶ 3. This type of monitoring qualifies as a special injury sufficient to establish these Plaintiffs' standing to sue. *See Mangini I,* 230 Cal.App.3d at 1137–38, 281 Cal.Rptr. 827.

2. *Statute of Limitations*

A three-year statute of limitations applies to Santa Clarita's and Valencia's public nuisance claims. *Mangini I,* 230 Cal. App.3d at 1142, 281 Cal.Rptr. 827. The effect of the statute on Plaintiffs' claims depends on whether the nuisance they allege is "permanent" or "continuing":

> In general, a permanent nuisance is considered to be a permanent injury to property for which damages are assessed once and for all, while a continuing nuisance is considered to be a series of successive injuries for which the plaintiff must bring successive actions.... With respect to a permanent nuisance, the statute of limitations begins to run on the creation of the nuisance and bars all claims after its passage, while each repetition of a continuing nuisance is considered a separate wrong which commences a new period in which to bring an action for recovery based upon the new injury.

*Beck Development Co. v. Southern Pacific Transportation Co.,* 44 Cal.App.4th 1160, 1216–17, 52 Cal.Rptr.2d 518 (1996).

The nuisance Plaintiffs complain of in this case is the perchlorate contamination on the Whittaker–Bermite site. Plaintiffs contend that perchlorate was released at the site as a result of the explosives manufacturing process. Plaintiffs themselves offer evidence that active operations at the site ceased in 1987. *See* Exh. A to July 9, 2002 Gee Decl. at 26 ("The Whittaker–Bermite facility is a former munitions and explosives manufacturing site that was in

operation from 1934 until 1987."). *See also* August 26 SGI ¶ 2, ¶ 3. Plaintiffs thereafter learned of contamination in their wells, in the Spring of 1997—admittedly more than three years before they filed this complaint. *See* July 29, 2002 SGI (filed in opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Fourth, Sixth, Seventh and Eighth Claims for Relief) ¶ 7.[20] Given these facts, Plaintiffs' nuisance claims are barred if contamination at the Whittaker–Bermite site is viewed as a permanent nuisance. *See Mangini I*, 230 Cal.App.3d at 1145 n. 13, 281 Cal.Rptr. 827 (plaintiffs' claims barred if for permanent nuisance where defendant used toxic substances—including ammonium perchlorate—on property from 1960 to 1970, plaintiffs had notice of contamination in 1984, and plaintiffs filed suit in 1988).

Plaintiffs may still be entitled to summary judgment, however, if the Whittaker–Bermite contamination is viewed as a continuing nuisance. In *Mangini v. Aerojet–General Corp.*, 12 Cal.4th 1087, 1097, 51 Cal.Rptr.2d 272, 912 P.2d 1220 (1996) [hereinafter *Mangini II* ], the California Supreme Court, adopting the lower appellate court's opinion, explained that the "crucial test of the permanency of a trespass or nuisance is whether the trespass or nuisance can be discontinued or abated."

Plaintiffs have proffered no evidence of abatability in support of their summary judgment motion.[21] Because Plaintiffs briefed this issue in opposition to Defen-

dants' now-withdrawn statute of limitations motion, however, the Court also has reviewed the evidence Plaintiffs submitted on that motion. For example, Plaintiffs point to the deposition of Robert J. DiPrimio as support for their continuing nuisance claim. DiPrimio did testify during deposition about a potential $36 million treatment program for water drawn from Plaintiffs' wells, DiPrimio Dep. (attached as Exh. B to the Yamamoto Decl. filed in opposition to Defendants' statute of limitations motion) at 150:12–151:9, but there is no evidence that this treatment facility would abate the actual nuisance—namely, the underground contamination emanating from the Whittaker–Bermite site. Mr. Manetta also testified that there is "technology to abate the problem in the groundwater off the site," Manetta Dep. (attached as Exh. C to the Yamamoto Decl.) at 235:12–23, but the California Supreme Court has rejected the contention that "mere technological feasibility proves abatability." *Mangini II*, 12 Cal.4th at 1099, 51 Cal.Rptr.2d 272, 912 P.2d 1220 (adopting opinion of California Court of Appeal).

### 3. *Summary of Ruling*

Plaintiffs are not entitled to summary judgment on their public nuisance claims, and because the same statute of limitations analysis also applies to Plaintiffs' private nuisance claims, *see Beck, supra* (private

---

**20.** This SGI was filed in opposition to a defense motion that has since been withdrawn, but the Court takes judicial notice of this undisputed fact.

**21.** Although abatability might be viewed as an element of Defendants' statute of limitations affirmative defense, those California courts that have addressed the issue have viewed the continuing (*i.e.* abatable) nature of a nuisance as an element of the plaintiff's case. *Beck Development Co.*, 44 Cal.App.4th at 1217, 52 Cal.Rptr.2d 518 ("A plaintiff cannot simply

allege that a nuisance is continuing in order to avoid the bar of the statute of limitations, but must present evidence that under the circumstances the nuisance may properly be considered continuing rather than permanent."); *Mangini II*, 12 Cal.4th at 1096–97, 51 Cal.Rptr.2d 272, 912 P.2d 1220 (noting that the lower court had treated abatability as an element of the plaintiff's case but declining to decide proper burden of proof). Plaintiffs themselves have pled abatability as an element of their nuisance claims. Compl. ¶ 59, ¶ 66.

nuisance claim), Plaintiffs' motion is denied as to those claims as well.

## WHITTAKER'S MOTION FOR SUMMARY JUDGMENT ON ITS COUNTERCLAIMS

Each of the Defendants has counterclaimed against each of the Plaintiffs for a declaratory judgment under § 107(a) and for contribution under CERCLA §§ 107(a) and 113(f). Whittaker now moves for summary judgment on its counterclaim against the Plaintiffs/Counter–Defendants [hereinafter "Counter–Defendants"] for contribution.

### I. Elements of Whittaker's *Prima Facie* Case

In order to succeed on its contribution claims, Whittaker must establish that (1) perchlorate is a hazardous substance;[22] (2) there has been a release of perchlorate at Counter–Defendants' facilities; (3) the release caused Whittaker to incur necessary response costs consistent with the NCP; and (4) Counter–Defendants are proper CERCLA defendants.[23] *See California v. Campbell,* 319 F.3d 1161, 1165 (9th Cir.2003); *Bedford Affiliates v. Sills,* 156 F.3d 416, 427 (2d Cir.1998). Whittaker must support its motion with evidence that would entitle it to a directed verdict on these elements. *C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.,* 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

In the briefs filed on Whittaker's motion, Counter–Defendants only dispute the second element listed above; they contend that their sites are not "facilities."

### A. Are NC–11, Saugus–1, Saugus–2 and VWC–157 CERCLA Facilities?

 Whittaker contends that the wells owned by Counter–Defendants Newhall, Santa Clarita and Valencia are CERCLA facilities. The statute's definition of the term "facility" explicitly includes wells, 42 U.S.C. § 9601(9), and this plain language analysis would appear to resolve the issue. Nonetheless, Counter–Defendants contend that their wells are covered by the limited exception to the definition of facility for "any consumer product in consumer use or any vessel." *Id.* As support for this position, Counter–Defendants rely almost entirely on *Vernon Village, Inc. v. Gottier,* 755 F.Supp. 1142 (D.Conn.1990) (Cabranes, J.).

The plaintiff in *Vernon Village* was a resident of a trailer park that bordered a polluted industrial site. 755 F.Supp. at 1145. The trailer park, the High Manor Mobile Home Park ("High Manor Park"), owned and operated a system of wells and pipes used to supply drinking water to High Manor Park residents. *Id.* Chromium from the neighboring industrial site, the Hillside Industrial Park ("Hillside"), traveled downgradient and contaminated High Manor's wells. *Id.* The plaintiff brought suit against, and eventually reached a settlement with, Precision Plating Corp. ("Precision")—the company located at Hillside that had actually been the source of the groundwater contamination. *Id.* at 1145–46. The plaintiff then brought suit against the company that owned High Manor Park (and the company's president) for failing to monitor the Park's water supply. *Id.* at 1146.

The district court granted summary judgment in the defendants' favor on plaintiff's CERCLA claim. Although the court

---

22. This element of Whittaker's *prima facie* case need not be considered in detail here because the analysis found above at pages 7 through 9 is applicable to Whittaker's motion.

23. The Court will not address necessity and consistency with the NCP in this order for the reasons discussed at note 3, *supra.*

noted that the defendants' wells appeared at first to fall squarely within CERCLA's definition of facility, the court ultimately concluded that the drinking water provided to plaintiff from the wells was a "consumer product in consumer use," and that the defendants could not be liable for contaminants contained in such a product. *Id.* at 1151.

This Court is not bound by district court opinions in another circuit, and the Court finds the analysis in *Vernon Village* unpersuasive. First, the *Vernon Village* court focused exclusively on the water within the defendants' wells, not on the wells themselves. *See* 42 U.S.C. § 9601(9) ("facility" defined to include wells). This distinction made some sense in the context of the *Vernon Village* plaintiff's case because her suit was based on contamination in water that was actually delivered to her home as a consumer product through the defendants' well and pipe system. *Id.* at 1149. But the same distinction does not make sense here. This case is not brought by parties who actually receive Counter–Defendants' water as a consumer product; unlike the contaminated water that sparked the *Vernon Village* suit, here the water is not a product currently made available to consumers for their use.

The *Vernon Village* holding also presents a conceptual difficulty. As a practical matter, CERCLA cases involving wells claimed to be facilities will likely always, or almost always, actually be about the water drawn from those wells. The inclusion of "well" within CERCLA's definition of "fa-

cility" would have little meaning if well *water* were always considered entirely separately. Indeed, several of the terms included in the definition of facility—for example, "pipe," "pit," "pond," "lagoon," "ditch" and "landfill"—would be stripped of significance if a similar hypertechnical analysis were applied to them.

In addition, *Vernon Village* rests on a weak precedential foundation. The court's analysis drew quite heavily on a Fifth Circuit case, *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059 (5th Cir.1990). *Dayton* held that asbestos manufacturers and suppliers could not be liable for costs incurred in removing asbestos from school buildings on the theory that they had "arranged for [asbestos] disposal or treatment." 906 F.2d at 1064 (quoting 42 U.S.C. § 9607(a)). The Fifth Circuit reasoned that the defendants' acts—which amounted to the installation of asbestos in school buildings—could not be considered "disposal" of asbestos. *Id.* The court also went on to express doubt whether any CERCLA "facility" was involved in the case, explaining that CERCLA was not intended to target "legitimate manufacturers or sellers of useful products." *Id.* at 1065.[24]

In the years since *Vernon Village*, the Fifth Circuit has reviewed its broad language in *Dayton* and has limited the holding of that case to its specific facts. *See Uniroyal Chemical Co., Inc. v. Deltech Corp.*, 160 F.3d 238 (5th Cir.1998). In *Uniroyal*, the Fifth Circuit first rejected an argument, based on language in *Day-*

---

**24.** In full, the *Dayton* court's analysis was as follows:

> It is clear that Congress did not intend CERCLA to target legitimate manufacturers or sellers of useful products. Rather, taken in context, the provision reflects Congress' desire to hold liable those who would attempt to dispose of hazardous wastes or substances under various deceptive guises

in order to escape liability for their disposal.

> The legislative history reinforces [the] argument that Congress intended to provide recovery only for releases or threatened releases from inactive and abandoned waste sites, not releases from useful consumer products in the structure of buildings.

*Id.* at 1065–66, 51 Cal.Rptr.2d 272, 912 P.2d 1220 (footnote omitted).

*ton*, that CERCLA applies only to inactive or abandoned hazardous waste sites.[25] *Id.* at 248–49 (rejecting contrary holdings in several district court cases, including *Vernon Village* ). As to CERCLA's consumer product exception, *Uniroyal* next explained that *Dayton* depended almost entirely on the "dispos[al]" requirement in § 9607(a)(3)—a requirement not found in the section of the statute, § 9607(a)(1), on which Whittaker's claims are based. *Id.* at 251–52. And because Dayton's commentary on the consumer product exception was *dicta* not supported by any specific citation to case law or legislative history, the Fifth Circuit has now limited *Dayton's* holding to the very specific issue addressed in that case—the claimed right of recovery in asbestos removal cases. *Id.* at 252 n. 16. Given this limitation, *Dayton* cannot provide sound support for the holding in *Vernon Village* (or for Counter–Defendants' position here).[26]

Finally, *Vernon Village* is unpersuasive because the *Vernon Village* court appears to have been influenced in its analysis of the definition of "facility" by the relative blamelessness of the defendants in that case. Indeed, the court explained its reasoning as follows:

Despite the apparent plausibility of plaintiff's argument that defendants own and operate a "facility"—after all, they do own wells, pipes and equipment for supplying water to the residents of the park—CERCLA is simply not the appropriate legal instrument with which to challenge the conduct of the defendants in this case. Defendants were as much "victims" of the contamination of the soil and groundwater at the Hillside Industrial Park as was the plaintiff. They have in no way caused or contributed to the release of the hazardous substances into the drinking water supply.

755 F.Supp. at 1151 (footnote omitted).

In this case, too, Counter–Defendants argue that they are essentially blameless. But that argument applies to Counter–Defendants' "innocent landowner" defense. It is within the context of that statutorily-provided defense—not with respect to the otherwise clear definition of "facility"—that Counter–Defendants' innocence argument finds its proper home.[27]

Counter–Defendants also cite *City of Portland v. Boeing*, 179 F.Supp.2d 1190, 1201 (D.Or.2001) as support for their position.[28] The defendant-polluters in that case argued that the plaintiffs were them-

**25.** The Court finds it disturbing that Counter–Defendants quote extensively from *Dayton* in their Memorandum (albeit by way of an indirect quotation through *Vernon Village* ) without mentioning the Fifth Circuit's later consideration of that case in *Uniroyal*.

**26.** The same is true for the Ninth Circuit's leading asbestos removal case, *3550 Stevens Creek Assoc. v. Barclays Bank of California*, 915 F.2d 1355 (9th Cir.1990), which reached a result similar to that reached by the Fifth Circuit in *Dayton*. In *3550 Stevens Creek*, the Ninth Circuit held that use of asbestos in building construction could not be considered "disposal" within the meaning of 42 U.S.C. § 9607(a)(2), which establishes PRP liability for past owners or operates who owned the facility in question at the time of waste disposal. 915 F.2d at 1362. *3550 Stevens Creek*

is of even less help to Counter–Defendants than *Dayton* might have been (at least pre-*Uniroyal* ) because it nowhere addressed the consumer product exception.

**27.** Moreover, once liability is determined, the Court will apply principles of equity to allocate costs among PRPs. Counter–Defendants' claimed blamelessness would be relevant at that stage if Counter–Defendants ultimately are held to be PRPs. *See Cadillac Fairview/California Inc. v. Dow Chemical Co.*, 299 F.3d 1019, 1025 (9th Cir.2002) (district courts will consider equitable factors in allocating costs among PRPs).

**28.** At oral argument, counsel for Counter–Defendants relied on one additional case, *Reading Co. v. City of Philadelphia*, 823 F.Supp. 1218 (E.D.Pa.1993). *Reading* is of no

selves PRPs because they owned contaminated wells. The court rejected that argument because the defendants provided no evidence that the plaintiffs' well contamination caused defendants to *incur response costs*—an element essential to CERCLA liability. *Id.* Thus, *City of Portland* turned on the response cost element of CERCLA's *prima facie* case—an element this Court will consider below—not simply on the fact that the plaintiffs were passive well owners.

Counter–Defendants argue more generally that they cannot be liable under CERCLA because their wells are not "abandoned and inactive hazardous waste disposal sites." Mem. at 3. Counter–Defendants contend that achieving the cleanup of such sites was CERCLA's only aim. But Counter–Defendants' reliance on an isolated quotation from the legislative history is unpersuasive in light of the enacted statute's broad definition of facility. Moreover, those appellate courts to have considered Counter–Defendants' argument have rejected it. *See Uniroyal,* 160 F.3d at 248–49, *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.,* 191 F.3d 409, 419 (4th Cir.1999).

In sum, the Court concludes that NC–11, VWC–157, Saugus–1 and Saugus–2 fall within CERCLA's definition of "facility."

B. *Is the "Valley's Groundwater" a Facility?*

 CERCLA's definition of "facility" includes any "site or area where a hazardous substance has ... come to be located." 42 U.S.C. § 9601(9). In its motion papers, Whittaker argues vaguely—and without analysis or case citation—that the "Valley's groundwater" is a "facility." Al-

though Counter–Defendants do not specifically take issue with this argument, the Court rejects it. Groundwater is neither a "site" nor an "area," at least as those terms are commonly understood. *See* Webster's Third New International Dictionary (defining "site" as "the original or fixed position of a thing," "the local position of a building, town, monument or similar work ...," *etc.;* defining "area" as "a level or relatively level piece of unoccupied or unused ground" or "a definitely bounded piece of ground set aside for a specific use or purpose"). Nor has Whittaker identified with *any* specificity the boundaries of this suggested "facility." Although the definition of "facility" is broad, Whittaker's unsupported assertion that the "Valley's groundwater" can be understood as a facility stretches the definition beyond reason and defies common sense.

C. *Was there a Release or Threatened Release of a Hazardous Substance?*

 CERCLA defines release as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). In this case, Counter–Defendants themselves contend that perchlorate has spread from other locations to contaminate the water in their wells. Indeed, as discussed above, perchlorate has been detected at the Newhall, Santa Clarita and Valencia wells.

Given these facts, the question before this Court is whether the passive migration of contaminant from another source into Counter–Defendants' wells constitutes a release at the wells.[29] The Court concludes that it does.

---

aid to Counter–Defendants. The *Reading* court held the consumer product exception *inapplicable* in that case and, in fact, explained that the exception was intended to protect *"individual consumers."* 823 F.Supp. at 1233 (emphasis added).

**29.** Elsewhere in its papers Whittaker also contends that perchlorate might have leaked through Plaintiffs' wells from one groundwater level to another, but Whittaker does not advance this theory as an example of a "release."

As noted above, CERCLA's definition of "release" includes the term "leaching." [30] Both the Second and Third Circuits have recognized that because the term "leaching" is "commonly used to describe passive migration," *ABB Industrial Systems, Inc. v. Prime Technology, Inc.*, 120 F.3d 351, 358 (2d Cir.1997), the inclusion of "leaching" within CERCLA's definition of "release" indicates that passive migration constitutes a "release." *Id.; United States v. CDMG Realty Co.*, 96 F.3d 706 (3d Cir. 1996). In *CDMG Realty*, the Third Circuit emphasized the term "leaching" in explaining the differences between CERCLA's definitions of "release" and "disposal":

> Most importantly, the definition of "release" includes the term "leaching," which is not mentioned in the definition of "disposal." "Leaching" is "the process or an instance of separating the soluble components from some material by percolation." [citation omitted]. Leaching of contaminants from rain and groundwater movement is a principal cause of contaminant movement in landfills, [citation omitted], and is the predominant cause of groundwater contamination from landfills, [citation omitted]. The word "leaching" is commonly used in the environmental context to describe this migration of contaminants. *See, e.g.,* Steven Ferrey, *The Toxic Time Bomb: Municipal Liability for the Cleanup of Hazardous Waste,* 57 Geo. Wash. L.Rev. 197, 207 n. 34 (1988) ("Leachate is liquid or water soluble contaminated substances that migrate away from the point source of contamination in groundwater or surface water, often influenced by rain and normal water table activities. Such a phenomenon is described as 'leaching' of contami-

nants."). Congress's use of the term "leaching" in the definition of "release" demonstrates that it was aware of the concept of passive migration ... and that it knew how to explicitly refer to that concept.

*CDMG Realty,* 96 F.3d at 715 (footnote containing additional citations omitted).

The Ninth Circuit has never decided whether CERCLA's definition of "release"—including the term "leaching"— covers contaminant migration. In *Carson Harbor Village, Ltd. v. Unocal Corp.,* 270 F.3d 863, 878–79 (9th Cir.2001), the Ninth Circuit held that passive migration does not constitute a "disposal" under CERCLA, but in reaching that conclusion the court specifically noted that the definition of "disposal," unlike "release," does not include the term "leaching." *Id.* at 878 ("[W]e can conclude that 'release' is broader than 'disposal,' because the definition of 'release' includes 'disposing' (also, it includes 'passive' terms such as 'leaching' and 'escaping,' which are not included in the definition of 'disposal')."). The appellate court also suggested that the inclusion of "leaching" in the definition of "release" may encompass passive migration, although that issue was not before the court: "If we try to characterize ... passive soil migration in plain English, a number of words come to mind, including gradual 'spreading,' 'migration,' 'seeping,' 'oozing,' and possibly 'leaching.' " *Id.* at 879.

In light of the persuasive analyses of the term "leaching" in *ABB Industrial Systems* and *CDMG Realty,* the Court concludes that "leaching" includes the passive migration of contaminant and that, as a result, a "release" within the meaning of 42 U.S.C. § 9601(22) has occurred at Counter–Defendants' wells.

---

**30.** Webster's Third New International Dictionary defines "leaching" as "the process or an instance of separate the soluble components from some material by percolation." "Leachate" is defined as "the liquid that has percolated through soil or other medium."

**D.** *Did Whittaker Incur Response Costs?*

▉▉▉ Whittaker contends that it has incurred recoverable costs in response to Counter–Defendants' well contamination because it has "undertaken an extensive and exhaustive search for other PRPs who may be responsible for some of the contamination detected in [the] wells." July 29 SGI ¶ 18.[31] As evidentiary support for this contention, Whittaker points to the expert report of G. Richard Rees. Rees is a hydrogeologist hired by Whittaker as a consultant. As part of his work for Whittaker, Rees conducted a search for "businesses that may have used perchlorate in the vicinity of [Plaintiffs'] wells." May 13, 2002 Expert Rep. of G. Richard Rees at 3.

In *Key Tronic Corp. v. United States*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), the Supreme Court considered whether attorneys' fees may appropriately be recovered as a CERCLA response cost. Although *Key Tronic* is not directly on point here because Whittaker has (at least so far) not identified attorneys' fees as response costs, the Supreme Court's analysis in *Key Tronic* is relevant because it also involved consideration of PRP search costs. *Key Tronic* held that CERCLA plaintiffs cannot recover attorneys' fees incurred in exclusively litigation-related matters but that costs (including attorneys' fees) incurred in connection with a search for other PRPs may be recovered. 511 U.S. at 819–21, 114 S.Ct. 1960. The Supreme Court explained its result by noting that a search for PRPs serves CERCLA's

statutory purpose because it leads to the identification of responsible parties and thereby speeds and encourages complete clean-ups.[32] *Id.*

Recent cases considering the recoverability of retained consultants' PRP search costs have cited *Key Tronic* as support for the proposition that such costs are recoverable even if they serve not only a statutory purpose, but a litigation-related purpose as well. *See Sealy Connecticut, Inc. v. Litton Industries, Inc.*, 93 F.Supp.2d 177, 190–91 (D.Conn.2000); *In re Combustion, Inc.*, 968 F.Supp. 1112, 1114 (W.D.La. 1996); *U.S. v. Atlas Minerals and Chemicals, Inc.*, 1995 WL 510304, *105–107 (E.D.Pa.1995). In other words, the fact that Whittaker likely hired consultants to search for PRPs in the hope that it might one day sue those PRPs for contribution does not preclude Whittaker's recovery of its search costs. Although the Court will determine the precise amount of Whittaker's recoverable response costs at a later stage, the Court finds that under *Key Tronic* Whittaker has presented evidence sufficient to establish that it has incurred some response costs "closely tied to the actual cleanup." *Key Tronic*, 511 U.S. at 820, 114 S.Ct. 1960.

**E.** *Are Counter–Defendants Proper CERCLA Defendants?*

This question is easily answered with respect to Newhall, Santa Clarita and Valencia. They are all current owners of the contaminated wells discussed above and thus fall within 42 U.S.C. § 9601(a)(1).

---

**31.** Counter–Defendants do not dispute that Whittaker has undertaken such a search. Instead, they argue that the search was unnecessary because Defendant Santa Clarita already had done much of the work. This argument goes to the necessity of Whittaker's response costs and will be considered later, when the Court addresses necessity and NCP consistency.

**32.** These same principles are inapplicable to litigation-related expert fees that are not directed toward identifying *new* PRPs. In *Calabrese v. McHugh*, 170 F.Supp.2d 243, 267–68 (D.Conn.2001), for example, the district court held that expert fees were not recoverable when they were directed toward providing *additional* support for claims against already-identified PRPs.

July 29, 2002 Statement of Genuine Issues [hereinafter "July 29 SGI"] ¶ 10.

■■■ Castaic's status is much less clear. Whittaker does not contend that Castaic owns any of the contaminated well-facilities. Instead, Whittaker cites the Supreme Court's decision in *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), which addressed the direct and derivative liability of parent companies as "operator[s]." Castaic is the sole owner of Plaintiff Santa Clarita, July 29 SGI ¶ 12, and Whittaker contends that Castaic is liable as an operator.

In *Bestfoods,* the Supreme Court first explained that a corporate parent can be derivatively liable if the corporate veil may be pierced under traditional corporate law principles. 524 U.S. at 63–64, 118 S.Ct. 1876. Whittaker makes no veil-piercing argument, however, so this portion of the *Bestfoods* opinion is of little relevance here.

*Bestfoods* also explained that a corporate parent may be liable if it *operates* its subsidiary's facility—that is, if it directs the workings of, manages or conducts the affairs of the facility. *Id.* at 66–67, 118 S.Ct. 1876. The mere fact that Castaic is Santa Clarita's sole owner is insufficient to satisfy this test. *See id.* According to Whittaker, however, Castaic may be held liable because it

> has been intimately involved in the management of drinking water supplies in the Valley, including acting on environmental and regulatory matters that were undertaken on its own behalf. [Castaic]'s laboratory has served as the water quality laboratory for most of the water purveyors in the Santa Clarita Valley.

[Castaic] has had extensive meetings with DHS related to what DHS would approve in the form of treatment mechanics for perchlorate. Castaic works very closely with the local water purveyors, and is engaged in an urban water management plan.

Although this account of Castaic's activities is undisputed, July 29 SGI ¶ 13, it does not constitute evidence that Castaic manages, directs or conducts the operations of Santa Clarita's facilities—its wells. *See Bestfoods,* 524 U.S. at 68, 118 S.Ct. 1876 (key question is whether the parent company "operates the facility"). Perhaps Whittaker's argument here is a counterpart to its contention that the "Valley's groundwater" is a CERCLA facility, but the Court has already rejected that theory.[33]

Because Whittaker fails to provide any basis for holding Castaic liable, its motion as to Castaic must be denied. However, the Court will go on to consider the remaining elements of Whittaker's claims against Newhall, Santa Clarita and Valencia.

### F. *The Innocent Landowner Defense*

■■■ Counter–Defendants contend that they are eligible for CERCLA's innocent landowner defense. In order to qualify as innocent landowners, Counter–Defendants must prove (1) that the release or threat of release of hazardous substances was caused solely by the acts of a third party, (2) that the third party was not an employee or agent of the Counter–Defendants, and (3) that the Counter–Defendants exercised due care with respect to perchlorate

---

**33.** Even if the Court did consider Valley groundwater a "facility," the Court could not agree with Whittaker that Castaic's actions relevant to Valley water quality mean that Castaic "operate[s]" the groundwater. Merely to state such a contention is to reveal its absurdity. Whittaker's argument would make anyone who works to assure water quality— *e.g.,* a federal agency that acts to force responsible parties to clean up a site—liable as an "operator."

and took precautions against foreseeable third-party acts or omissions. 42 U.S.C. § 9607. *See also Servco Pacific Inc. v. Dods,* 193 F.Supp.2d 1183, 1197 (D.Hawai'i 2002). This defense is construed narrowly to further CERCLA's remedial purpose. *Lincoln Properties, Ltd. v. Higgins,* 823 F.Supp. 1528, 1539 (E.D.Cal.1992).

Counter–Defendants would bear the burden of proving this affirmative defense at trial, and they must come forward with evidence sufficient to create a genuine issue of material fact as to the innocent landowner defense. *See Digital Control Inc. v. McLaughlin Manufacturing Co., Inc.,* 248 F.Supp.2d 1015, 1017 (W.D.Wash. 2003) (where non-moving party would bear the burden of proof at trial on an affirmative defense, that party must present evidence establishing a genuine issue of material fact).

### 1. *Caused Solely By Third Parties Who Are Not Employees or Agents*

■ The Court concludes that Counter–Defendants have presented evidence sufficient to create a genuine issue as to whether the perchlorate releases at or from their wells were caused solely by third-party acts. Dustan Campbell, Newhall's Superintendent, William J. Manetta, Santa Clarita's President, and Robert J. DiPrimio, Valencia's President, declare that Newhall, Santa Clarita and Valencia have not used, disposed of, or arranged for the disposal of perchlorate. Campbell Decl. ¶¶ 7–8; Manetta Decl. ¶¶ 7–8; DiPri-

mio Decl. ¶¶ 7–8.[34] They also declare that no employees or agents of the Plaintiffs caused the release of perchlorate and that the Plaintiffs do not have any contractual relationship with Whittaker. Campbell Decl. ¶ 9; Manetta Decl. ¶ 9; DiPrimio Decl. ¶ 9.[35]

Whittaker does offer some evidence that pumping at Counter–Defendants' wells may have helped draw perchlorate toward the wells, and that the structure of the Valencia and Newhall wells may have allowed perchlorate entering the wells close to surface level to travel down through the wells to the lower-level Saugus formation. Specifically, Whittaker's expert N. Thomas Sheahan opines:

(1) that pumping from Plaintiffs' wells likely caused an "increased vertical flow" of groundwater down from the Alluvial Aquifer into the Saugus Formation, Sheahan Rep. (attached as Exh. C. to the July 10, 2002 Vandenburg Decl.) at 35;

(2) that pumping from Plaintiffs' wells likely "induc[ed] lateral flow" in the Saugus Formation toward the wells, *id.* at 35–36; and

(3) that in the Valencia and Newhall wells, the "Saugus formation is hydraulically connected, by the perforated zones and/or gravel packs in [the] wells, to the overlying alluvial aquifer." *Id.* at 19.

---

**34.** These three declarations are attached to Counter–Defendants' July 29, 2002 opposition.

**35.** Whittaker objects to these declarations on hearsay grounds because Campbell, Manetta and DiPrimio make these statements based on "personal knowledge and ... inquiry of other management personnel" working at Newhall, Santa Clarita and Valencia. Campbell Decl. ¶¶ 7–9, Manetta Decl. ¶¶ 7–9, DiPrimio Decl. ¶¶ 7–9. The Court agrees that these declar-

ants cannot introduce others' hearsay statements through their own declarations. Fed. R.Evid. 801. But the Court finds that under Fed.R.Evid. 807, the declarants' additional reliance on their own personal knowledge, and the familiarity with the Counter–Defendants' records and practices that their upper-level management positions necessarily entail, provide admissible evidentiary support for the declarants' statements that is sufficient to create a genuine issue of material fact.

As to point (3), Sheahan opines that the Newhall well in particular could act as a conduit for contamination traveling down within the well itself from the alluvial aquifer to the Saugus formation. *Id.* at 22.

Plaintiffs respond by pointing to evidence that:

(1) the Alluvial Aquifer *naturally* recharges the Saugus, even without any well pumping, *see* July 29 SGI ¶ 2, Ohland Rep. at 25 ("Groundwater in the Alluvial aquifer is ... a source or recharge to the underlying Saugus Formation.");

(2) the *natural* flow of groundwater carries contaminant from the Whittaker-Bermite site to Plaintiffs' wells, *see* List Rep. at 8, Figures 11, 12 ("[D]ata show unequivocally that the general direction of flow of groundwater is to the northwest ...."), Todd Rep. at 8 ("[G]roundwater flow in the Saugus Formation in the vicinity of the Site is to the northwest."); and

(3) any transfer through the wells themselves would be quite minor or insignificant compared to the natural recharge. Dep. of Dennis Williams (attached as Exh. H to the July 29, 2002 Gee Decl.) at ¶¶ 18:6–27:15.

Judge Levi considered facts quite similar to these in *Lincoln Properties, supra,* a case cited by Whittaker itself. In *Lincoln Properties* case, the owner of shopping center from which pollutants had been released sued to recover response costs from San Joaquin County. 823 F.Supp. at 1532. The shopping center owner, Lincoln Properties, Ltd. ("Lincoln"), claimed that the County was partly responsible because the contaminants discharged from the shopping center had leaked from the County's wells and sewer lines. *Id.* Although Judge Levi agreed with Lincoln that there had been releases from the County's facilities, *id.* at 1535–39, he held that the County successfully established its status as an

innocent landowner. *Id.* at 1539–44. *See also Fireman's Fund Ins. Co. v. City of Lodi,* 302 F.3d 928, 946 (9th Cir.2002) (citing *Lincoln Properties* and noting, in dicta, that "it is doubtful whether [a defendant] may be considered a PRP merely as a result of operating [a] municipal sewer system").

In considering the requirement in 42 U.S.C. § 9607 that to qualify as an innocent landowner the releases had to be caused solely by the acts of third parties, Judge Levi rejected a rule that would have made the defense unavailable to the County simply because the County wells and sewers might have been the site of quite minimal releases. The Court finds Judge Levi's reasoning in support of this conclusion persuasive and provides a rather lengthy quotation here:

The phrase "caused solely by" is ambiguous, particularly when read in context of the entire section.... [T]he concept of causation is a subtle one in the law and has different meanings in different contexts. One could read the provision strictly such that virtually any evidence of a release from a defendant's facility would preclude assertion of the third party defense, since the release in such case would not be caused "entirely" by third parties. However, this construction, which is similar to "but for" causation in tort law, would eliminate the [innocent landowner] defense. The defense is provided to one who is already liable for a release. If the fact of a release amounts to causation then the defense is a nullity. Moreover, the provision contemplates that the defendant claiming the defense "exercised due care with respect to the hazardous substance concerned" and "took precautions." These aspects of the defense make little sense if causation is interpreted so literally as to forbid any contact with the

hazardous substance which may have permitted or facilitated a release.

*Id.* at 1540. After considering several different interpretations of the Clean Water Act's third-party defense, the defense on which CERCLA's innocent landowner provision was based, Judge Levi adopted the following standard:

[T]he court holds that "caused solely by," as used in CERCLA, incorporates the concept of proximate or legal cause. If the defendant's release was not foreseeable, and if its conduct—including acts as well as omissions—was "so indirect and insubstantial" in the chain of events leading to the release, then the defendant's conduct was not the proximate cause of the release and the third party defense may be available.

*Id.* at 1540–42.

Several district courts have adopted the causation standard announced in *Lincoln Properties. See Advanced Technology Corp. v. Eliskim, Inc.,* 96 F.Supp.2d 715, 718 (N.D.Ohio 2000); *United States v. Meyer,* 120 F.Supp.2d 635, 640 (W.D.Mich. 1999); *United States v. Iron Mountain Mines, Inc.,* 987 F.Supp. 1263, 1274 (E.D.Cal.1997). At least one court has instead adopted a "but for" causation standard. *United States v. Poly–Carb, Inc.,* 951 F.Supp. 1518, 1530–31 (D.Nev.1996). And one court appears to have adopted a combination of both. *G.J. Leasing Co., Inc. v. Union Electric Co.,* 854 F.Supp. 539, 567 (S.D.Ill.1994).

No matter which of these standards is applied here, the Court finds that Counter–Defendants have at least created a genuine issue of material fact as to sole causation. Specifically, Counter–Defendants' evidence that neither they nor their agents nor employees used perchlorate supports an inference that any release of perchlorate at the wells was not foreseeable to Plaintiffs. And Counter–Defendants' expert evidence that the effect of pumping from the wells was insignificant compared to the natural flow of contaminant supports an inference either that Counter–Defendants were not a "but for" cause of the releases or that their acts were "so indirect and insubstantial in the chain of events leading to the release" that the innocent landowner defense still should be available to them. *Lincoln Properties,* 823 F.Supp. at 1542 (internal quotation marks omitted).

### 2. Due Care and Precautions against Foreseeable Acts

The due care and precautions requirements lend themselves to a combined analysis. For example, the Second Circuit has explained that the precautions requirement "demands that the defendant shall have taken adequate precautions against actions by the third party that would lead to a release of hazardous waste." *State of New York v. Lashins Arcade Co.,* 91 F.3d 353, 360 (2d Cir.1996). Similarly, Counter–Defendants can prove that they exercised due care if they "took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances." *Id.* at 361 (2d Cir.1996) (quoting H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 34 (1984)). *See also Iron Mountain Mines,* 987 F.Supp. at 1276 (adopting *Lashins Arcade* standard). Such precautions would include "those steps necessary to protect the public from a health or environmental threat." *Lashins Arcade,* 91 F.3d at 361 (quotation marks and citation omitted). Whether Counter–Defendants exercised due care is a determination that must be made "in light of all relevant facts and circumstances," 42 U.S.C. § 9607(b)(3), and participation in the development of remedial plans is evidence of due care. *City of Emeryville v. Elementis Pigments, Inc.,* 2001 WL 964230, *9 (N.D.Cal.2001).

In this case, Counter–Defendants offer evidence that they: (1) tested their wells for perchlorate contamination, (2) ceased operation of the perchlorate contaminated wells in the drinking system, (3) notified local government bodies of their decision to removal the wells from service, (4) participated in numerous meetings about the Santa Clarita Valley's perchlorate problem with state agencies and citizen groups, (5) participated in meetings with the Army Corps of Engineers regarding the Corps' plans to study and characterize the area's perchlorate pollution problem, and (6) filed this lawsuit to obtain capital necessary for removing the perchlorate pollution. Campbell Decl. ¶¶ 2–6 (for Newhall); Manetta Decl. ¶¶ 2–6 (for Santa Clarita); DiPrimio Decl. ¶¶ 2–6 (for Valencia).[36] Counter–Defendants also offer evidence that their wells were designed and installed in accordance with applicable construction standards at the time, including pollution prevention standards. Decl. of Dennis E. Williams ¶ 3, ¶ 6, ¶ 10, ¶ 13.[37] Finally, Counter–Defendants offer evidence that even experts were not aware of perchlorate as a potential contaminant hazard until after the last of Counter–Defendants' wells was sited in 1988. *See* Goodrich Dep. (attached as Exh. 0 to July 29, 2002 Gee Decl.) at 46:7–9 (Question: "When you did the studies for these other contaminants [prior to 1997], primarily [volatile organic compounds], why didn't you undertake a study of potential sources of perchlorate contamination?" Answer: "We did not know whether perchlorate was—it wasn't on our radar screen."); Ohland Dep. (attached as Exh. P to July 29, 2002 Gee Decl.) at 154:10–14 (Question: "Was perchlorate contamination even considered a problem in 1986 or '88 for groundwater supplies, to your knowledge? ..." Answer: "Not to my knowledge.").[38]

Whittaker contends that Counter–Defendants should have done more. For example, Whittaker faults Counter–Defendants for not exercising due care with respect to perchlorate before anyone (even Whittaker's experts) knew perchlorate to be a problem. Reply at 9 ("Plaintiffs cite to their conduct in 1997 and later, but completely fail to present any evidence as to their conduct *prior to* discovery of perchlorate in their wells."). But Whittaker cites to no authority for such a requirement, and even recognizes in its own reply papers that "an innocent landowner is incapable of exercising due care with respect to a particular hazardous substances if the likely presence of that substance is unknown." Reply at 10. Whittaker's expert, James A. Goodrich,[39] opines that Counter–

36. Whittaker's evidentiary objections to the cited portions of these declarations are OVERRULED. The declarants' upper-level management positions and their statements that they have personal knowledge of these facts provide sufficient foundation.

37. Whittaker's evidentiary objections to the cited portions of the Williams declaration are OVERRULED.

38. The objection to this question in the Ohland Deposition as vague and speculative is OVERRULED.

39. Goodrich holds a Bachelor of Science degree in Geology and an interdisciplinary Master of Science degree in Engineering Geology and Water Resources Engineering. He is currently an independent water resources and environmental consultant specializing in water resources management and strategic planning, groundwater recharge systems, conjunctive use planning, aquifer storage and recovery (ASR) systems, and seawater intrusion management. From 1987 to 1992, Goodrich was the Director of Basin Management for the Orange County Water District, and in 1992, he became executive director of the San Gabriel Basin Water Quality Authority. Expert Rep. of James A. Goodrich (attached as Exh. F to the July 10, 2002 Vandenburg Decl.) at 1.

Defendants failed to exercise due care during the 1980s and 1990s because they did not develop "programs to manage their groundwater resources." Goodrich Rep. at 3. Goodrich does not explain, however, what such programs would entail or how they would even be related to the problem or potential problem of perchlorate contamination. *See id.*

Goodrich also opines that Counter–Defendants should have done more than simply take their wells out of service after discovering contamination. Goodrich states that other water agencies have taken "an active role in understanding and mitigating their groundwater resources problems." *Id.* at 14. Although Counter–Defendants do not provide evidence that they have begun to destroy their wells, *cf. Lincoln Properties,* 823 F.Supp. at 1544 (defendant took steps to destroy its wells "in a manner intended to prevent the possible flow of contamination through those wells"), they do proffer evidence that they have taken an "active role" in understanding and remediating the perchlorate problem. *See* Campbell Decl. ¶¶ 2–6; Manetta Decl. ¶¶ 2–6; and DiPrimio Decl. ¶¶ 2–6. For example, Counter–Defendants notified local authorities of the perchlorate problem, participated in meetings related to the Army Corps of Engineers study, and filed this lawsuit. This evidence is at least sufficient to survive Whittaker's motion for summary judgment.

Whittaker cites *Westfarm Associates Limited Partnership v. Washington Suburban Sanitary Comm'n,* 66 F.3d 669 (4th Cir.1995), as support for its position, but *Westfarm* actually does little to help Whittaker's case. The Fourth Circuit did hold in *Westfarm* that "CERCLA does not

sanction willful and negligent blindness," but this statement has little relevance here. 66 F.3d at 683 (internal quotation marks and citation omitted). The defendant sanitary commission attempting to assert an innocent landowner defense in *Westfarm* knew that the contaminant PCE was being discharged into its sewer system, knew that its regulations actually allowed for such discharge, and knew that its sewers were cracked. *Id.* at 682–83. Yet the commission took none of the steps it could have taken to improve the situation—it did not mend its sewer pipes or even change its regulations to ban PCE dumping. *Id.* at 683.

The commission in *Westfarm* may well have been, as the Fourth Circuit held, willfully and negligently blind. But the evidence submitted by these Counter–Defendants supports a permissible inference that they were not. There is no evidence that Counter–Defendants expressly permitted contaminant releases as the *Westfarm* commission did. Instead, Counter–Defendants have proffered evidence that they took steps to protect the public—their drinking water customers—from contamination, and in light of all the facts and circumstances, they have at least created a genuine issue as to their innocent landowner defense.[40]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part. It is DENIED as to Plaintiffs' nuisance claims and Plaintiff's CERCLA claims against RFI. It is GRANTED as to Plaintiffs' CERCLA claims against Whittaker

---

**40.** This conclusion also defeats Whittaker's motion for summary judgment on its HSAA claim. As both parties agree, HSAA "create[s] a scheme that is identical to CERCLA with respect to who is liable." *City of Emery-*

*ville v. Elementis Pigments, Inc.,* 2001 WL 964230, *11 (N.D.Cal.2001). *See also Goe Engineering Co., Inc. v. Physicians Formula Cosmetics, Inc.,* 1997 WL 889278, *23 (C.D.Cal.1997).

and SCLLC in the following respect: Whittaker and SCLLC are liable for Plaintiffs' necessary and NCP consistent response costs.

Defendant Whittaker's Motion for Summary Judgment is DENIED. Whittaker has failed to establish that Castaic is within the classes of CERCLA liable parties, and Newhall, Valencia and Santa Clarita have proffered evidence sufficient to create a genuine issue on their innocent landowner defense.

The result reached on Whittaker's motion means that the exact nature of Plaintiffs' status as PRPs, and of Plaintiffs' claims against Defendants, remains unresolved. If Plaintiffs are themselves PRPs, then they will have CERCLA claims against Defendants only for contribution, and this Court will consider various equitable factors in allocating response costs. *See Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1301 (9th Cir. 1997) (claim by one PRP against another is for contribution); 42 U.S.C. § 9613(f)(1) (court should consider appropriate equitable factors in allocating costs). If, on the other hand, Plaintiffs establish at trial that they cannot be liable, then Whittaker and SCLLC will be jointly and severally liable unless they can prove that the harm they caused is divisible. *Carson Harbor,* 270 F.3d at 871.

IT IS SO ORDERED.